O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| j2 GLOBAL COMMUNICATIONS, INC., | ) | Case No. CV 09-04189 DDP (AJWx) |
| | ) | |
| Plaintiff, | ) | **CLAIM CONSTRUCTION ORDER** |
| v. | ) | |
| | ) | [Plaintiffs' Opening Claim |
| EASYLINK SERVICES INTERNATIONAL CORPORATION, | ) | Construction Brief Filed on June 11, 2010, <u>Markman</u> hearing held on |
| | ) | July 29, 2010] |
| Defendant. | ) | |
| _____ | ) | |

The plaintiff, j2 Global Communications, Inc. ("j2") is the owner of U.S. Patent Numbers 6,208,638 ("'638 Patent"); 6,350,066 ("'066 Patent"); 6,597,688 ("'688 Patent"); and 7,020,132 ("'132 Patent").  j2 alleges that Captaris, Inc. and Easylink Services International Corp. (collectively "Defendants") have offered to sell and provide, have sold and provided, and continue to offer to sell and provide products and services that infringe one or more claims of the patents.

After reviewing the materials submitted by the parties and holding a claim construction hearing on July 29, 2010, the court construes the four disputed claim terms related to the '688 Patent and the '132 Patent in the manner set forth below.

## I.   BACKGROUND AND PATENTS-IN-SUIT

### A.   Generally

The technology at issue relates to user receipt and transmission of facsimile and telephone messages over the Internet, and of ways to making those messages available to users.  The '688 and '132 Patents, which share common specifications and drawings, relate to the ability of the user to send messages via e-mail that can be received at a facsimile machine.  The '688 and '132 Patents generally relate to a message that a user is sending, or an "outbound" message.

A reexamination certificate issued March 11, 2008, for the '688 Patent, determining that all of claims 1-27 were patentable as originally issued.

## II.   THE CLAIM CONSTRUCTION PROCESS

A patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed; and (2) comparing the properly construed claims to the accused device.  See generally Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).  The first step in this sequence is presently before the Court.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  The construction of a particular patent claim term presents a question of law, to be decided by the Court.  Markman, 517 U.S. at 391.

///

1    The starting point for claim construction is a disputed term's
2    ordinary meaning.  <u>Phillips</u>, 415 F.3d at 1313.  Ordinary meaning,
3    in the patent claim construction context, is the meaning that a
4    person of ordinary skill in the art would attribute to a claim term
5    in the context of the entire patent at the time of the invention,
6    i.e., as of the effective filing date of the patent application.
7    <u>ICU Med., Inc. v. Alaris Med. Sys., Inc.</u>, 558 F.3d 1368, 1374 (Fed.
8    Cir. 2009).

9    The claims, of course, do not stand alone; a person of
10   ordinary skill in the art "is deemed to read [a] claim term not
11   only in the context of the particular claim in which the disputed
12   term appears, <u>but in the context of the entire patent, including</u>
13   <u>the specification</u>."  <u>Phillips</u>, 415 F.3d at 1313-14 (emphasis
14   added).  Accordingly, the specification is "the <u>primary basis</u> for
15   construing the claims" in light of the "statutory requirement that
16   the specification describe the claimed invention in full, clear,
17   concise, and exact terms."  <u>Id.</u> at 1315 (internal quotation marks
18   omitted) (emphasis added).

19   In determining the proper construction, the claim language,
20   specification, and prosecution history – together referred to as
21   the "intrinsic evidence" – are of paramount importance.  <u>Id.</u> at
22   1315 ("[T]he best source for understanding a technical term is the
23   specification from which it arose, informed, as needed, by the
24   prosecution history." (emphasis added) (internal quotation marks
25   omitted)).  Consistent with this principle, courts have recognized
26   that the specification may reveal a special definition given to a
27   claim term by the patentee that differs from the meaning it would
28   otherwise possess.  <u>Id.</u> at 1316.  In such cases, the inventor's

3

1  lexicography governs.  Id.  In other cases, the specification may

2  reveal an intentional disclaimer, or disavowal, of claim scope by

3  the inventor.  Id.

4      While the court interprets claim terms in light of the

5  specification, it should generally not "import[] limitations from

6  the specification into the claims absent a clear disclaimer of

7  claim scope." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d

8  1361, 1373 (Fed. Cir. 2007).  "[T]he distinction between using the

9  specification to interpret the meaning of a claim and importing

10 limitations from the specification into the claim can be a

11 difficult one to apply in practice." Phillips, 415 F.3d at 1323.

12 In walking this "tightrope," Andersen, 474 F.3d at 1373, the court

13 hews to the question of "how a person of ordinary skill in the art

14 would understand the claim terms." Phillips, 415 F.3d at 1323.

15     Consideration of intrinsic evidence will resolve any claim

16 term ambiguity in most circumstances.  See id. at 1313-14.  Where

17 it does not, however, the Court may consider certain "extrinsic

18 evidence." See id. at 1317.  Expert testimony, for example, may

19 provide helpful background on the technology at issue, explain how

20 an invention works, or establish that a claim term has a particular

21 meaning in the relevant field.  See id. at 1319.  Dictionaries and

22 treatises may also be helpful in this regard.  Id. at 1318.

23 Precedent counsels against reliance on dictionary definitions at

24 the expense of the specification, however, because such reliance

25 "focuses the inquiry on the abstract meaning of words rather than

26 on the meaning of claim terms within the context of the patent."

27 Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145

28 (Fed. Cir. 2005).

1    The court's ultimate goal is to construe the disputed terms in

2  a manner consistent with the way the inventor defined them and a

3  person of ordinary skill in the art would understand them.   "The

4  construction that stays true to the claim language and most

5  naturally aligns with the patent's description of the invention

6  will be, in the end, the correct construction."   <u>Phillips</u>, 415 F.3d

7  at 1316 (internal quotation marks omitted).

8  **III. THE CLAIM TERMS**

9       1. "outbound resource/ first outbound resource"

| j2 CONSTRUCTION | EASYLINK CONSTRUCTION[1] | CAPTARIS CONSTRUCTION[2] | COURT CONSTRUCTION |
|---|---|---|---|
| A server that converts the input request message to an appropriate format capable of being received by one of a fax machine, telephone, or paging terminal | A server that converts the input request message to an appropriate format capable of being received by one of a fax machine, telephone, or paging terminal and then transmits that converted message to a final destination | A server that converts the input request message to an appropriate format capable of being received by one of a fax machine, telephone, or paging terminal and then transmits that converted message outside of the system | A server that converts the input request message to an appropriate format capable of being received by one of a fax machine, telephone, or paging terminal |

There is no dispute that the '688 and '132 Patents describe a

system that ultimately results in transmission of a message outside

---

[1]   Easylink's proposed construction is taken from the
Supplemental Claim Construction Brief of Defendant Easylink
Services International Corporation, Docket Number 192, filed with
the court on August 3, 2011.

[2]   Captaris's proposed construction is taken from the Captaris
Inc.'s Supplemental Claim Construction Brief Regarding the Term
"Outbound Resource," Docket Number 230, filed with the court on
August 3, 2011.

the system.  Nor is there any dispute that the outbound resource will transmit the message somewhere.  The dispute, ultimately, comes down to whether the Patents require that a single physical device both convert the input request message into a format capable of receipt by a fax machine and transmit the message to the ultimate recipient, without the message passing through any intermediate device after leaving the outbound resource.

Captaris and Easylink offer constructions of "outbound resource" that limit the device to one that sends the message either "outside of the system" or to a "final destination" respectively.  In support of their positions, Defendants point to the "Detailed Description of the Invention" in the '688 Patent, which describes "specific embodiments."  ('688 Patent, 2:51-63.) One such embodiment describes a system where, for example:

> "the message is assigned to one or more outbound resources [] for delivery to the intended recipient" ('688 Patent, 3:24-4:2);
> "In the case of faxes, the outbound resource is a server which dials the destination fax number and sends the fax" ('699 Patent, 4:4-6.);
> "In the case of voice messages, the outbound resource is a server which dials the destination telephone number and plays the voice message." ('688 Patent, 4:7-10.)

Easylink argues that importing its proposed limitation from the specification into the claims is warranted in this instance because the only invention disclosed in the patent is one in which the outbound resource performs both conversion and transmission to the final destination.  (Easylink's Supplemental Brief 4:4-8.) Easylink cites ICU Medical, Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1375 (Fed. Cir. 2010), in support of its argument that

1   where the specification only suggests one possible definition, then

2   the court should adopt that definition.  The court disagrees.

3        It is a basic tenant of claim construction that the court

4   "will not limit broader claim language to [a single embodiment]

5   unless the patentee has demonstrated a clear intention to limit the

6   claim scope using words or expressions of manifest exclusion or

7   restrictions." <u>Abbot Labs. v. Sandoz, Inc.</u>, 566 F.3d 1282, 1288

8   (Fed. Cir. 2009) (internal citation omitted); <u>see also</u> <u>Phillips</u>,

9   415 F.3d at 1323 (noting that the court has "expressly rejected the

10  contention that if a patent describes only a single embodiment, the

11  claims of the patent must be construed as limited to that

12  embodiment").  In <u>ICU Medical</u>, the court was considering whether a

13  spike described by the patent could be anything other than pointed.

14  558 F.3d at 1375.  In that case, all of the figures showed a

15  pointed spike and the patent "neither described piercing as

16  optional nor any non-piercing item as a spike." <u>Id.</u>  Moreover, in

17  that case, there was absolutely no support offered — intrinsic or

18  extrinsic – for a definition of spike that was not pointed.  <u>Id.</u>

19       Here, first, nothing in the specification demonstrates a clear

20  intention to limit the claim scope to the embodiment Easylink

21  relies on.  Indeed, the Patents expressly caution that although

22  "specific embodiments are set forth to provide a thorough

23  understanding of the present invention . . . it will be understood

24  by one skilled in the art, that the invention may be practiced

25  without these details." ('688 Patent, 2:57-63.)  Second, the '688

26  Patent unambiguously foresees a general and pervasive separation of

27  the functions described by the Patent and the number of devices.

28  It describes that in one embodiment, "each one of database server

1   [], system management unit [], mail server [], and client [], are

2   stand-alone computers or workstations containing the hardware and

3   software resources to enable operation," however "[i]n alternate

4   embodiments, the functions provided by each [of the devices listed

5   above] are provided by any number of computer systems."  ('688

6   Patent, 10:36-44.)  For these reasons, the court finds the

7   reasoning of ICU Medical inapplicable here.  The court will not

8   limit the claim to the preferred embodiment, and the court adopts

9   j2's proposed construction of  "outbound resource/ first outbound

10  resource."

                    2. "router-filter"

| j2 CONSTRUCTION | EASYLINK & CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A computer program running on a processing server that routes request messages to a communications server | Software running on the processing server that (1) routes a request message from the message queue to an outbound resource; and (2) filters notification messages for pager delivery. | A computer program running on a processing server that routes request messages to a communications server |

19  Claims 1 and 10 of the '688 Patent and Claim 1 of the '132

20  Patent require a "router-filter."  The parties dispute the proper

21  definition of the term "router-filter."  Defendants argue that j2

22  seeks to "artificially broaden" the scope of the term "router-

23  filter" by ignoring half of what the device does.  (See Easylink's

24  Response Brief 32:24-17.)  Defendants contend that a "router-

25  filter" must necessarily be something that (1) routes a request

26  message from the message que to the outbound resource; and (2)

27  filters notification messages for pager delivery.  (Id. 32:24-

28  33:1.)   Because j2's definition fails to encompass both these

8

aspects of the router-filter, Defendants argue that their proposed
construction should be adopted.

j2 counters that Defendants are improperly importing
functionality into the definition of the term; that such an import
is duplicative; and that there is no basis in the Patent to limit
"router-filter" to a device that filters messages for pager
delivery.  (Pl.'s Reply Brief 48:2-5.)

In short, Defendants and j2 agree that, in certain
embodiments, the router-filter performs the function of routing and
the function of filtering.  The parties differ as to if a router-
filter must always - regardless of whether it preforms the function
of a filter — contain the capacity to filter.  The court has
considered the specification, the claim terms, the Patents in their
entirety, and the parties' arguments.  Although the preferred
embodiment describes a system whereby the router-filter, i.e. "a
computer program running on [the] processing server," first "polls"
the message que for pending requests, then routes the message to
the customer, and finally filters the message "for possible pager
notification," the court agrees with j2 that what is claimed is not
a system that necessarily filters each routed message "for possible
pager notification."  ('688 Patent, 7:3-18.)  Indeed, it is quite
clear from the claims that the two Patents claim a system that
receives a message, e.g. an email, and converts it to a fax ('688
Patent 14:37-60), or, a system that receives a message, e.g. an
email, and converts it to a page ('688 Patent 15:23-33).
Accordingly, the court rejects Defendants' proposed construction as
overly limiting.  The court is persuaded, based on the language of
the claims, that a router-filter may either route messages or route

1   and filter messages, but not every router-filter necessarily has

2   the capacity for both functions.  The Patents do not require such a

3   result.  The court adopts j2's proposed construction of "router-

4   filter."

5                        3. "customer"

| j2<br>CONSTRUCTION | EASYLINK & CAPTARIS<br>CONSTRUCTION | COURT CONSTRUCTION |
| --- | --- | --- |
| A user of the system who transmits request messages to the system through an external packet-switched data network. | A paying user of the system who resides outside of the internal network and transmits request messages to the system through an external packet-switched data network. | A user of the system who transmits request messages to the system through an external packet-switched data network. |

14        The parties dispute the proper construction of the term

15   "customer."  Defendants would limit customer in the '688 and '132

16   Patent to (1) a paying user and (2) a user located outside of the

17   internal network.  (See, e.g., Captaris' Reply Brief 40:1-24.)

18   Defendants rely on the dictionary definition of customer in support

19   of the former requirement and the prosecution history in support of

20   the later.  The court finds both limitations unsupported by the

21   Patents.

22        Both parties argue that TABLE 3 of the '688 Patent supports

23   their position.  TABLE 3 indicates that the bill type of a user

24   includes, among others, "Customer," "free," and "corporate."  ('688

25   Patent 5:28.)  The court agrees with j2 that the table does not

26   require that a customer be a paying user.

27        The '688 Patent makes consistent use of the term "customer"

28   throughout, and, indeed, both parties agree that a user is referred

                                  10

1   to in the Patent as a "customer."  The fact, therefore, that one

2   type of bill, as reflected in Table 3, could be "free," satisfies

3   the court that a user could have a "free" bill type.  That is,

4   there could be a user, i.e. customer, that does not pay.  There is

5   absolutely no other support or mention in the Patents of any

6   requirement that the customer be a paying customer.  It is known to

7   one with ordinary skill in the art that a customer need not

8   necessarily be a paying customer. Customers of Google's email

9   service, Gmail, for example, do not pay. The court, therefore,

10  declines to adopt an unsupported limitation based on one

11  dictionary's definition of customer.  Phillips, 415 F.3d at 1318.

12      With respect to the requirement that the customer be "outside"

13  of the internal network, the court has examined the prosecution

14  record provided by the parties. (See Captaris' Claim Construction

15  Brief, Ex. 35.)  The history states that "the requested messages

16  are received from a customer over the external packet-switched

17  network, in other words outside of the internal network that

18  contains the elements of the claimed system.  Thus, the customer of

19  the service in effect 'resides' outside of the internal network."

20  (Id. at 11 (emphasis added).)  The history goes on to contrast the

21  claimed system with another, Baudoin, which has customers that are

22  "not in an external network, but are rather actually part of the

23  internal network . . . ."  (Id.)  The court is mindful of

24  Defendants' concern here that the definition of customer adequately

25  capture the requirement that a customer "in effect" reside outside

26  of the internal network.  However, the court is persuaded that this

27  limitation is captured by j2's proposed construction.  According to

28  j2's construction, a customer of the claimed system is one who

"transmits requests messages . . . through an external packet-switched data network."  No more is required.  The court adopts j2's proposed construction of customer.

        4. "validate/validating a customer associated with said request message after accessing the account information in the database server"

| j2 & CAPTARIS CONSTRUCTION | EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
| --- | --- | --- |
| Determining, by accessing account information in a database server, that the customer account for the customer associated with the request message is identified as being active | Determining, by accessing account information in a database server after the router-filter obtains the request message, that the customer account for the customer associated with the request message is identified as being active | Determining, by accessing account information in a database server, that the customer account for the customer associated with the request message is identified as being active |

    j2 and Captaris agree that the construction of "validate/validating a customer associated with said request message after accessing the account information in the database server," should be "determining, by accessing account information in the database server, that the customer account for the customer associated with the request message is identified as being active." Easylink argues that this construction misses a necessary temporal requirement, namely that the "determining" of a customer's status occurs <u>after</u> the router filter obtains the request message.

    In support of its position, Easylink relies on a description of an embodiment in the '688 Patent; a December 6, 2006, statement of the Examiner; and a statement in the Amendment and Response to Office Action, dated April 29, 2004.  (Easylink's Opening Claim Construction Brief 39:13-40:27.)  As explained above, absent

1  contravening evidence from the specification or prosecution

2  history, plain and unambiguous claim language controls the

3  construction analysis, and it is generally improper to import a

4  limitation from an embodiment into the claims.  DSW, Inc. v. Shoe

5  Pavilion, Inc., 537 F.3d 1342, 1347 (Fed. Cir. 2008).  Here,

6  neither the Patents' specification nor prosecution history support

7  the temporal limitation Easylink proposes.

8      In a Notice of Intent to Issue Ex Parte Reexamination

9  Certificate in the '688 Patent, the Examiner stated:

10         Claim 19 also recites "validating a customer
           associated with said obtained request message
11         after accessing the account information in the
           database server."   Thus, prior art that
12         validates   the   customer   before   accessing
           account in a database server, such as those
13         systems capable of caching account information
           in a local device, would not read upon the
14         plain and clear language of the claims.

15  (Snyder Decl., Ex. S at 3.)  Without more, this statement by the

16  Examiner, which distinguishes prior art that validates a customer

17  before accessing the account — in contrast with the present

18  invention, which validates the customer by accessing the account,

19  does not impose the limitation Easylink seeks.  Accessing the

20  account is not necessarily the same as the router-filter receiving

21  the request message.

22      Easylink further relies on the following statement in the

23  Amendment and Response to Office Action:

24         Turning    now    to    claim    13,    applicants
           respectfully submit that Gerszberg does not
25         teach or suggest such a method in which an
           email message is received from an external
26         packet  network,  a  database  lookup  in  an
           internal  packet  network  is  performed  to
27         correlate  the  email  message  with  a  user
           account, the email message is verified to be

28

                                    13

1           associated with a valid user account and
2   converted into a set of fax tones.

3   (Snyder Decl., Ex. P at 9-10.) Again, this summary of Claim 13 of

4   the '132 Patent does not stand for the construction that Easylink

5   proposes.  The Amendment summarizes the steps listed in the claim,

6   but it does not limit the sequence of their performance.  As a

7   general rule, it is erroneous to construe the steps of a method

8   claim as necessarily occurring in the order in which they are

9   recited.  See, e.g., Altiris, Inc. v. Symantec Corp., 318 F.3d

10  1363, 1369-71 (Fed. Cir. 2003); Interactive Gift Express, Inc. v.

11  Compuserve Inc., 256 F.3d 1323, 1343 (Fed. Cir. 2001).  Here, there

12  is no language in, e.g., Claim 13 that explicitly requires that

13  each of its steps be performed in the order recited.  Additionally,

14  the court finds no support in the specification, embodiments,

15  figures, or additional claim language for a rigid ordering of the

16  claim steps.  Accordingly, the court rejects Easylink's proposed

17  construction, and adopts j2 and Captaris' construction.

**IV.    CONCLUSION**

18      For the reasons set forth above, the court adopts the claim

19  constructions described above.

20

21

22  IT IS SO ORDERED.

23

24  Dated: October 20, 2011

25                                DEAN D. PREGERSON
                                  United States District Judge

26

27

28