O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| j2 GLOBAL COMMUNICATIONS, INC., | ) ) ) | Case No. CV 09-04189 DDP (AJWx) |
| Plaintiff, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL |
| v. | ) ) ) | PERKINS COIE AND TO COMPEL DISCOVERY |
| EASYLINK SERVICES INTERNATIONAL CORPORATION, | ) ) ) | [Motion filed on Oct. 15, 2012] |
| Defendant. | ) | |

## I. **Introduction**

Plaintiff j2 Global Communications, Inc. has filed a Motion to Disqualify Counsel Perkins Coie and to Compel Discovery ("Motion") in three patent infringement cases ("the Three Current Cases") pending before this court.  (Dkt. No. 77.)[1]  Plaintiff Advanced Messaging Technologies, Inc. is a co-Plaintiff and co-movant in two of the cases (9-4150 and 11-4239) (Plaintiffs are collectively called "j2").  In each case, one or more of the following corporations is a defendant: Open Text Corporation ("Open Text")

---

[1]The three case numbers are: 11-4239, 9-4189, and 9-4150.  As each Motion essentially implicates the same issues in each case, all cites will be to the 11-4239 case, unless otherwise noted.

1  EasyLink Services International Corporation ("EasyLink"), and

2  Captaris, Inc. ("Captaris") (collectively "Defendants").  Open Text

3  owns Easy Link and Captaris.  Perkins Coie ("Perkins") represents

4  the Defendants.  In late 2011, Open Text contacted Crowell & Moring

5  ("Crowell") about assigning one of its attorneys to temporarily

6  serve as Open Text's outside in-house counsel for intellectual

7  property matters.  Crowell assigned an attorney ("the Attorney") to

8  fill this role, even though a conflicts check revealed the Attorney

9  formerly represented j2.  In fact, he worked on cases on behalf of

10 j2 that involved three of the four patents at issue in the Three

11 Current Cases.  As Open Text's outside in-house counsel, the

12 Attorney had contact with Perkins.  The court therefore

13 disqualifies Perkins.  This outcome is unfortunate, because there

14 is not a molecule of evidence that Perkins did anything other than

15 act with integrity and in a manner consistent with the highest

16 traditions of the legal profession.

17     In reaching its decision, the court has considered j2's _in_

18 _camera_ evidence, which includes billing records of the Attorney's

19 work for j2, and various emails that the Attorney sent and received

20 in the course of his j2 representation.  (_In Camera_ Evidence of

21 Billing Records and Emails ("_In Camera_ Evidence").)

22 **I. Background**

23     **A. The Attorney's Experience at the Time He Represented j2**

24     The Attorney worked at Kenyon & Kenyon ("Kenyon") from 2002 to

25 2005, and began representing j2 as part of a team of attorneys in

26 2004.  (Bernstein Decl. ¶¶ 4-5, Dkt. No. 77-2.)  Crowell maintains

27 that assigning the Attorney to Open Text was appropriate in part

28 because he was only "a junior associate" when he represented j2.

(Sacks Decl. Ex. F at 16, Dkt. No. 77-3.)  Although the Attorney was an associate in 2004, by the end of that year he had many years of experience as a software engineer, studied graduate-level Computer Science, graduated *cum laude* from a reputable law school (where he served as Managing Editor of the *Law Review*), edited a publication about the International Trade Commission, co-authored another about patent litigation, and delivered a speech about international patent licensing.  (Johnson Decl. Ex. 14, Dkt. No. 113.)

### B. The Work the Attorney Performed for j2

Crowell also asserts that the Attorney cleared its conflicts check because he allegedly told Crowell that "he did not recall having access to any confidential information," and his representation of j2 "involved primarily the review of publicly available patent documents."  (Sacks Decl. Ex. B. at 6, Dkt. No. 77.)

The records before that court indicate that from 2004 until 2005 the Attorney represented j2 in patent litigation, and he billed j2 for 234.7 hours of work.  (Id. ¶¶ 5-6; In Camera Evidence.)  Based on the court's knowledge of law firm practices, 234.7 hours probably represents about ten percent of his billing over the roughly fifteen months that he worked on j2 matters. Specifically, the Attorney billed j2 69.8 hours for his work on *j2 Global Communications, Inc. v. Venali, Inc.* ("*Venali*"), 84.6 hours for *j2 Global Communications, Inc. v. CallWave, Inc.* ("*CallWave*") (collectively "the Prior Cases"), and 56 hours for "Bobo" patent analysis.  (Bernstein Decl. ¶¶ 2, 6-7.)

In the *Venali* and *Callwave* actions, j2 alleged infringement of U.S. Patent Nos. 6,208,638 ("'638 Patent") and 6,350,066 ("'066 Patent), and it also alleged infringement of U.S. Patent No. 6,597,688 ("'688 Patent") in the *Venali* case.  (Bernstein Decl. ¶ 2.)  A number of patents comprise the Bobo patents, and the '066 Patent is one of them.  (Bernstein Decl. ¶ 7.)  j2 alleges that the '638 and '688 Patents were infringed in each of the Three Current Cases, and that the '066 Patent was also infringed in two of those cases.[2]

The Attorney's billing records from Kenyon indicate he was involved in the following tasks on behalf of j2: "reviewing claim charts, performing infringement analyses, searching for and analyzing prior art, drafting a validity opinion, analyzing documents for a settlement conference, reviewing and commenting on draft pleading, discussing discovery strategies, drafting discovery requests and responses, and drafting j2's opposition to a summary judgment motion in the *Venali* action." (Bernstein Decl. ¶ 6; <u>In Camera</u> Evidence.)  The Attorney sent, received (sometimes directly, sometimes by forwarding), or was copied on over 120 emails to or from j2's General Counsel.  (Bernstein Decl. ¶ 9; <u>In Camera</u> Evidence.)  These emails were sent to about seven or eight individuals, and sometimes involved evaluations of j2's cases.  (<u>In Camera</u> Evidence.)  One email the Attorney received analyzed possible infringement defenses.  (Bernstein Decl. ¶ 12; <u>In Camera</u> Evidence.)  That email discussed Dr. David Farber ("Dr. Farber"),

---

[2]Those two are case numbers 11-4239 and 9-4150.

1  and whether his activities are relevant to an on-sale bar defense.[3]

2  (In Camera Evidence.)  (Bernstein Decl. ¶ 12; In Camera Evidence.)

3  In the Three Current Cases, Defendants claim products that Dr.

4  Farber was allegedly involved in testing and analyzing give rise to

5  an on-sale defense to j2's '688 and '638 patent infringement

6  claims.  (Defendant's Answer to Amended Compl. ("Answer") at 10:24-

7  15:5, Dkt. No. 48.)  In 2005, the year that the Attorney left

8  Kenyon, the United States Patent Office began a multi-year

9  reexamination of the '066, '638, and '688 Patents, which led to

10  changes in at least the '066 and '638 Patents.  (Carmody Decl. ¶¶

11  16-18, Dkt. No. 101; See id. Exs. E-K.)

12  **C. History of the Three Current Cases**

13       j2 filed two of the Three Current Cases on June 26, 2008, and

14  the other on May 17, 2011.[4]  EasyLink is a defendant in two of the

15  actions ("the EasyLink Cases") (case numbers 9-4189 and 11-4239),

16  and Open Text and Captaris are defendants in the other (9-4150).

17  Open Text owns both of these other companies, acquiring Captaris in

18  2008 and EasyLink in 2012.  (Davies Decl. ¶ 2.)  Open Text retained

19  an attorney ("Lead Trial Counsel") to represent it and Captaris in

20  2008, before Lead Trial Counsel was at Perkins.  (See Carroll Decl.

21  ¶ 5, , Dkt. No. 100.)  Lead Trial Counsel moved to Perkins in

22

---

23       [3]The on-sale bar affirmative defense invalidates a patent if "(1) the

24  invention at issue had become the 'subject of a commercial offer for sale' more
    than one year before the filing of the patent application; and (2) the invention

25  was ready for patenting, either by, for example, having that invention reduced
    to practice or by preparing 'drawings or other descriptions of the invention'

26  that would enable one skilled in the art to practice the invention." Special
    Devices, Inc. v. OEA, Inc., 270 F.3d 1353, 1354-55 (Fed. Cir. 2001) (quoting

27  Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67-68 (1998).

28       [4]Compl., Dkt. No. 3 (case no. 9-4150); Compl., Dkt. No. 3 (case no. 9-
    4189); Compl., Dkt. No. 1 (case no. 11-4239).

1  February 2012, and Open Text made Perkins its counsel of record

2  when he did.  (Carroll Decl. ¶¶ 14-15.)  Lead Trial Counsel and

3  another Perkins attorney began advising Open Text about the

4  EasyLink acquisition in mid-February 2012.  (Id. at ¶ 20.)  It is

5  unclear when Perkins began working on the EasyLink Cases, but it

6  was before Dr. Farber's deposition, which took place on July 27,

7  2012.  (Id. ¶¶ 28-29.)

8       **D.  The Conflicts Check and the Attorney's Open Text Assignment**

9       The Attorney is now Counsel at Crowell.  (Johnson Decl. Ex.

10  14.)  In 2011, Open Text began searching for an in-house attorney

11  to work on "intellectual property and patent matters," but was

12  "unable to fill the role even as Open Text's intellectual property

13  and patent needs grew."  (Davies Decl. ¶ 6.)  It asked Crowell to

14  provide an attorney who could temporarily assume this position

15  until a permanent candidate was selected.  (Id.)  As discussed,

16  Crowell assigned the Attorney to fill this role, even though it

17  knew that he previously represented j2 (Id. ¶ 9; Sacks Decl. Ex. B

18  at 6.)

19       j2 was never asked to sign a conflict waiver, allowing the

20  Attorney to work for Open Text.  (Bernstein Decl. ¶ 13.)  Perkins

21  likewise knew nothing about the Attorney's prior involvement with

22  j2.  (See Parker Decl. ¶ 4, Dkt. No. 103; Carroll Decl. ¶ 24.)

23       The Attorney told Open Text's General Counsel that while he

24  was at Kenyon he "performed a public art search relating to a Bobo

25  patent," and the General Counsel states that he "did not understand

26  this to mean that [the Attorney] had worked for j2." (Parker Decl.

27  ¶ 4.)

28  ///

**E. The Attorney's Role in the Three Current Cases**

In his role with Open Text, the Attorney met with Perkins on a number of occasions. (Id. ¶ 6.)  Crowell has described the Attorney's work for Open Text as follows:

> He was given an initial assignment for Open Text during the fourth quarter of 2011 to familiarize himself with the company's products and pending IP litigations.  That process included his introductions to Perkins Coie lawyers representing Open Text . . . .  Later, he was asked to assist Open Text in collecting documents for Perkins Coie's use in responding to discovery requests.  As [the Attorney] became more familiar with the j2 litigation, he followed Perkins Coie's litigation work and provided his views and comments thereon to Open Text in-house counsel, together with reports on the progress of the litigation.  After j2 proposed that the parties mediate their dispute, [the Attorney] assisted Open Text with preparation for the mediation that was to have occurred in May 2012.

(Sacks Decl. Ex. F. at 16, Dkt. No. 77.)  j2 learned of the Attorney's role at Open Text on July 27, 2012, during the deposition of Dr. Farber, when he introduced himself as Open Text's "outside in-house counsel" to one of j2's attorneys at Kenyon (Bernstein Decl. ¶ 13.)  At the Farber deposition, j2's attorney announced that the Attorney used to be an associate at Kenyon, and that he would check whether the Attorney worked on j2 patent matters.  (Carroll Decl. ¶ 30.)  The next week, j2's attorney informed Perkins and Open Text that the Attorney had worked for j2. (Id.)

Two events followed the Farber deposition, but it is unclear which occurred first.  The Attorney met with EasyLink's counsel of record at the time, King & Spaulding, "where we [King & Spalding] presented to [the Attorney] our evaluation of the litigation." (Sacks Decl. Ex. J at 32.)[5]  Additionally, Perkins and Open Text

---

[5]As discussed, Perkins began working on the EasyLink Cases sometime before
(continued...)

1  ended communication with the Attorney.  (Davies Decl. ¶ 15; Carroll

2  Decl. ¶¶ 31-32.)

3  **II. <u>Legal Standards and Analysis</u>**

4       There are five issues: (1) Whether California law governs;(2)

5  Whether the court should presume the Attorney learned confidential

6  information about j2 that is relevant to the Three Current Cases;

7  (3) Whether the court should presume that the Attorney shared j2's

8  confidential information with Perkins; (4) Whether such a

9  presumption is irrebutable; and (5) Whether disqualifying Perkins

10 is required.

11      Regarding the first issue, California law governs.  <u>In re</u>

12 <u>County of Los Angeles</u>, 223 F.3d 990, 995 (9th Cir. 2000).  As to

13 the second through fifth, the California Supreme Court has stated

14 the following:

15      That enduring duty to preserve client confidences precludes an
       attorney from later agreeing to represent an adversary of the
16     attorney's former client unless the former client provides an
       informed written consent waiving the conflict.  If the attorney
17     fails to obtain such consent and undertakes to represent the
       adversary, the former client may disqualify the attorney by
18     showing a substantial relationship between the subjects of the
       prior and the current representations.  To determine whether
19     there is a substantial relationship between successive
       representations, a court must first determine whether the
20     attorney had a direct professional relationship with the former
       client in which the attorney personally provided legal advice
21     and services on a legal issue that is closely related to the
       legal issue in the present representation.  If the former
22     representation involved such a direct relationship with the
       client, the former client need not prove that the attorney
23     possesses actual confidential information.  Instead, the
       attorney is presumed to possess confidential information if the
24     subject of the prior representation put the attorney in a
       position in which confidences material to the current
25     representation would normally have been imparted to counsel. .
       .  .  When a substantial relationship between the two
26

27 ──────────────
       [5](...continued)
28 the Farber deposition, but Perkins did not appear as counsel of record on behalf
   of EasyLink until October 11, 2012.  (<u>See</u> Carroll Decl. ¶ 21.)

1   representations is established, the attorney is automatically
    disqualified from representing the second client. . . .
2   Vicarious disqualification rules are a product of decisional
    law.   Normally, an attorney's conflict is imputed to the law
3   firm as a whole on the rationale that attorneys, working
    together and practicing law in a professional association, share
4   each other's, and their clients', confidential information.

5   City & County of San Francisco v. Cobra Solutions, Inc., 38 Cal.

6   4th 839, 847-48 (2006) (internal citations and quotation marks

7   omitted).   The facts in this Motion are not typical of

8   disqualification motions generally because the Attorney worked as

9   Open Text's outside in-house counsel, not as a Perkins attorney.

10  However, the court holds the above-quoted rule applies here.   The

11  Attorney's prior representation involved three of the four patents

12  at issue in the Three Current Cases, as well as an on-sale bar

13  defense related to Dr. Farber's activities.   The prior

14  representation is, thus, substantially similar to the Three Current

15  Cases.   Because the Attorney was outside in-house counsel for Open

16  Text on IP matters, and because of his contact with Perkins,

17  Perkins must be disqualified.

18      A.   **California Law Governs**

19      Defendants argue that while federal courts in California look

20  to California law in deciding a disqualification motion, state law

21  does not bind them in the way that a diversity case would, because

22  federal courts are governed by their own rules of professional

23  conduct.   (Defendant's Opposition to Plaintiffs' Motion to

24  Disqualify ("Opp'n") at 12:26-13:7, Dkt. No. 97.)   The Ninth

25  Circuit, however, has made clear that a federal court in California

26  must apply California law in a disqualification motion.   In re

27  County of Los Angeles, 223 F.3d at 995 ("[W]e apply state law in

28  determining matters of disqualification.").

1   Defendants' argument relies principally on a footnote from an
2   unpublished Northern District of California case. <u>Openwave Sys.,</u>
3   <u>Inc. v. 724 Solutions (US) Inc.</u>, No. C 09-3511 RS, 2010 WL 1687825,
4   at *5 n.6 (N.D. Cal. Apr. 22, 2010).  However, even that case
5   applied California law, because its local rule required attorneys
6   to adhere to "California State Bar standards."  <u>Id.</u>  The Central
7   District similarly requires attorneys to "comply with the standards
8   of professional conduct required of members of the State Bar of
9   California and contained in the State Bar Act, the Rules of
10  Professional Conduct of the State Bar of California, and the
11  decisions of any court applicable thereto."  Cent. Dist. L.R. 83-
12  3.1.2.  The Central District rule "adopt[s]" such California
13  "statutes, rules and decisions."  <u>Id.</u>  California law, therefore,
14  governs.

15      B.  <u>**The Court Presumes the Attorney Possesses Confidential**</u>
16          <u>**Information about j2**</u>

17      It is presumed that an attorney has relevant confidential
18  information about a client if there is a substantial relationship
19  between the prior representation and the current one.  <u>Cobra</u>
20  <u>Solutions</u>, 38 Cal. 4th at 847.  In determining whether there is
21  substantial relationship, the court should first analyze whether
22  there was a direct relationship between an attorney and the former
23  client, and whether that relationship touched issues related to the
24  present litigation.  <u>Id.</u>  Courts emphasize shared communications in
25  determining whether there was a direct relationship.  <u>See e.g.</u>
26  <u>Farhang v. Indian Inst. of Tech.</u>, No. C-08-02658RMW, 2009 WL
27  3459455, at *2 (N.D. Cal. Oct. 27, 2009).  During the Attorney's
28  time representing j2, he and j2's General Counsel were part of a

group of about seven or eight attorneys that regularly sent emails to each other. (Bernstein Decl. ¶ 9; In Camera Evidence.)  In total the Attorney and j2's General Counsel were parties to over 120 emails.  (Id.)  One email concerned Dr. Farber, and his relevance to an on-sale bar defense, which is also at issue in the Three Current cases.  (In Camera Evidence.)  Many of these emails focused on the Prior Cases, where three of the four patents currently at issue were litigated. (Id.)  Some of the emails relating to the Prior Cases shared drafts of papers that would later be filed with the court, and others assessed the strength of j2's cases.  (Id.)  In light of these exchanges, the court finds that a direct relationship between the Attorney and the client existed.

When an attorney had direct contact with a client, a substantial relationship exists if "the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel." Cobra Solutions, 38 Cal. 4th at 847.  The substantial relationship test is "necessarily fact-dependant." UMG Recordings, Inc. v. MySpace, Inc., 526 F. Supp. 2d 1046, 1060 (C.D. Cal. 2007).  Courts look to the degree of overlap in "subject-matters, facts or issues" to determine whether there is a substantial relationship.  See id. (quoting H.F. Ahmanson & Co. v. Salomon Brothers, Inc., 229 Cal. App. 3d 1445, 1453 (1991)).  Subject matter similarity is the most important.  Jessen v. Hartford Cas. Ins. Co., 111 Cal. App. 4th 698, 711 (2003) (suggesting that the California Supreme Court has decided that "a 'substantial relationship' exists whenever the 'subjects' of the prior and the current representations are linked in some rational

1  manner") (citing <u>Flatt v. Superior Court</u>, 9 Cal. 4th 275, 283

2  (1994)).  A "subject" is "broader . . . than the discrete legal

3  and factual issues involved in the compared representations," as

4  it includes "information material to the evaluation, prosecution,

5  settlement or accomplishment of the litigation or transaction

6  given its specific legal and factual issues."  <u>Jessen</u>, 111 Cal.

7  App. 4th at 712-13.

8      Defendants argue that there is no substantial relationship

9  because the Three Current Cases "involve different defendants,

10  claims and evidence," and they emphasize that "[i]n the

11  intervening years between [the Attorney's j2 representation and

12  his representation of Open Text], the patents have been reexamined

13  by the PTO and their claims have been substantially altered."

14  (Opp'n at 22:7-10.)  It is true that the patents have been

15  altered, but to different degrees.  (<u>See</u> Opp'n 10:13-21 (claiming

16  the reexamination process required "extensive changes to the '066

17  patent" and "significant changes to the '638 patent," but not

18  noting any level of change in the '688 patent); <u>see also</u> Carmody

19  Decl. ¶¶ 16-18 (describing the changes similarly).)

20      More importantly, nothing requires the court to extensively

21  analyze the patents' modifications, nor to do an in-depth

22  comparison of the products.  To the contrary, a rational link

23  between the subject matter of the two cases will suffice.  <u>Jessen</u>,

24  111 Cal. App. 4th at 711 (2003); <u>Knight v. Ferguson</u>, 149 Cal. App.

25  4th 1207, 1213 (2007).[6]  In addition to other matters the Attorney

26

27      [6]Anything more than a "rational link" test would effectively require a
    mini-trial on the merits, entailing a comparison of the patents as they existed
28  initially with any subsequent modifications.  Expert testimony would then likely
                                                        (continued...)

1  billed to j2, he billed j2 154.4 hours for work on the Prior

2  Cases, which involved three of the four patents at issue in the

3  Three Current Cases. (<u>See</u> Bernstein Decl. ¶¶ 2, 6.)

4      Additionally, the on-sale bar defense was at issue in the

5  cases the Attorney worked on as j2's attorney, and as j2's

6  attorney he received an email evaluating Dr. Farber's relevance to

7  this defense. (<u>In Camera</u> Evidence.) Dr. Farber's activities are

8  relevant to a possible on-sale bar defense in the Three Current

9  Cases, as well. (<u>See</u> Answer at 10:24-15:5.) In fact, j2 learned

10 of the Attorney's work with Open Text in the Three Current Cases,

11 when he attended Dr. Farber's deposition. (Bernstein Decl. ¶ 13.)

12 In disputing Dr. Farber's importance to the disqualification

13 analysis, Defendants argue that they knew about him, along with

14 his import to an on-sale bar defense, before the Attorney became

15 involved with Open Text. (Opp'n at 8:6-11; Carmody Decl. ¶¶ 9-12;

16 Bellows Decl. ¶ 2, Dkt. No. 104.) However, the Attorney still

17 could have provided additional useful to Perkins concerning Dr.

18 Farber. Because the Prior Cases are substantially related to the

19 Three Current Cases the court presumes that the Attorney possessed

20 confidential information. <u>See</u> <u>Cobra Solutions</u>, 38 Cal. 4th at

21 847-48.

22     At times, Defendants refer to the Attorney as a "junior

23 associate," and assert that there is a "lack of evidence" about

24 _____

25     [6](...continued)
   have to be presented and evaluated. Such a time-consuming process would add

26 little value. The court would still not know whether the former attorney may
   have, even unwittingly, communicated important information about, for example,

27 the financial strength of the former client, the former client's settlement
   strategy, the former client's perceived strengths or weaknesses of its claims or

28 defenses, and other information that might give counsel an unfair advantage in
   the litigation.

both the "nature of the work" he did for j2 and whether he acquired confidential information about j2. (Defendants' Supplemental Brief in Support of Defendant's Opposition to j2's Motion to Disqualify Perkins Coie and Compel Discovery ("Supp. Opp'n.") at 10:22-11:5, Dkt. No. 122.) However, a de minimis level of involvement with a prior case is sufficient for presuming that an attorney acquired confidential information about that prior case. See Pound v. DeMera DeMera Cameron, 135 Cal. App. 4th 70, 73-74 (2005) (finding that a one-hour phone call about a case three years earlier was sufficient to presume that an attorney acquired confidential information).

Regardless, both the Attorney's professional experience and the extent of his work for j2 were significant. At the time he was representing j2, he had authored and edited publications about intellectual property, done graduate work in computer science, and worked for many years as a software engineer. (Johnson Decl. Ex. 14). Additionally, in camera evidence shows that his work in the Prior Cases included: "reviewing claim charts, performing infringement analyses, [reviewing] prior art . . . analyzing documents for a settlement conference, reviewing and commenting on draft pleading, discussing discovery strategies, drafting discovery requests and responses, and drafting j2's opposition to a summary judgment motion . . ." (Bernstein Decl. ¶ 6; In Camera Evidence.) In some of this work, such as discussing discovery strategies and participating in the creation and editing of motions and pleadings, the likelihood that he learned confidential information is readily apparent. In others, such as reviewing prior art, the risk may seem less likely. However, confidential

1  information may guide prior art reviews—such as an instruction

2  from a partner or client about the weaknesses of certain features.

3      C.   **The Court Presumes that Perkins has the Same**

4          **Confidential Information about j2 as the Attorney**

5      The general rule is that presuming an attorney possesses

6  confidential information requires presuming the same for his law

7  firm ("the Vicarious Presumption Rule").   <u>See</u> <u>People ex rel. Dept.</u>

8  <u>of Corporations v. SpeeDee Oil Change Sys., Inc.</u>, 20 Cal. 4th

9  1135, 1146 (1999) (ruling that "a presumption that an attorney has

10  access to privileged and confidential matters relevant to a

11  subsequent representation extends the attorney's disqualification

12  vicariously to the attorney's entire firm"); <u>see</u> <u>id.</u> at 1153-54

13  (explaining that, "[t]he vicarious disqualification rule

14  recognizes the everyday reality that attorneys, working together

15  and practicing law in a professional association, share each

16  other's, and their clients', confidential information").   The

17  Attorney, however, does not work at Perkins. Rather, he was

18  outside in-house counsel for Open Text on intellectual property

19  matters.   (Davies Decl. ¶¶ 6, 9; Bernstein Decl. ¶ 13.)   This

20  court is not aware of any case analyzing whether the Vicarious

21  Presumption Rule applies to such a situation. However, some cases

22  have analyzed whether presuming an attorney at one law firm has

23  confidential information requires making the same presumption

24  about another firm that is co-counsel with the tainted attorney.

25  These cases come out different ways, but the cases applying the

26  Vicarious Presumption Rule to co-counsel have the better argument.

27      Three Northern District of California cases suggest that

28  presuming co-counsel possesses confidential information is

1    inappropriate. In re Airport Car Rental Antitrust Litig., 470 F.

2    Supp. 495, 506 (N.D. Cal. 1979); see also Canatella v. Krieg,

3    Keller, Sloan, Reilley & Roman LLP, No. C 11-05535 WHA, 2012 WL

4    847493, at *2 (N.D. Cal. Mar. 13, 2012) (making no mention of a

5    presumption, and relying on Airport Car Rental to suggest that a

6    multi-factor analysis is required to determine whether co-counsel

7    has confidential information); Oracle Am., Inc. v. Innovative

8    Tech. Distributors, LLC, No. 11-CV-01043-LHK, 2011 WL 2940313, at

9    *6 (N.D. Cal. July 20, 2011). Other cases have applied the

10   Vicarious Presumption Rule and presumed that co-counsel received

11   confidential information. Pound, 135 Cal. App. 4th at 77 (noting

12   the Vicarious Presumption Rule, and holding that "there is no

13   logical or substantive manner to distinguish" between a firm

14   employing a tainted attorney and a firm serving as co-counsel with

15   a tainted attorney); Beltran v. Avon Products, Inc., 867 F. Supp.

16   2d 1068, 1078, 1084 (C.D. Cal. 2012) (stating the Vicarious

17   Presumption Rule, and applying it against co-counsel, because

18   "[i]t is also reasonable to assume that the two law firms engaged

19   in fairly extensive discussions about the case and Plaintiff's

20   litigation strategy before filing their complaint and prior to the

21   erection of an wall ethical segregating [the tainted attorney]

22   from the case").

23        This court concludes that the Vicarious Presumption Rule

24   should be applied here (i.e., that it should be presumed that

25   Perkins has relevant confidential information about j2.) The

26   three Northern District cases that did not apply the Vicarious

27   Presumption Rule to co-counsel are not persuasive. They do not

28   consider applicable California law. Oracle and Canatella rely

heavily on Airport Car, which was decided in 1979. Canatella, 2012 WL 847493, at *2, Oracle,, 2011 WL 2940313, at *5.  It seems neither Oracle nor Canatella considered Pound, a California appellate case that presumed co-counsel possessed the tainted attorney's confidential information.  Pound, 135 Cal. App. 4th 70, 77 (2005).  And Pound does not appear to have been briefed in either case.  (Johnson Decl. Exs. 6-11.)  Canatella even incorrectly declares that on "the issue of disqualification of co-counsel . . . no California . . . cases [are] directly on point." Canatella, , 2012 WL 847493, at *2.  Additionally, California courts have generally ignored these three cases.  Airport Car is the only one cited in any California opinion, and a single case from 1980 is the only one that cites its holding approvingly. Chadwick v. Superior Court, 106 Cal. App. 3d 108, 117 n.9 (1980).

More importantly, the reasoning behind the Vicarious Presumption Rule indicates that it should also be applied against Perkins: "Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." Cobra Solutions, 38 Cal. 4th at 847-48. (internal quotation marks omitted.)  The Attorney served as Open Text's outside in-house counsel for intellectual property matters, and the Three Current Cases are high-stakes, complex patent matters.  The importance of in-house counsel effectively cooperating, coordinating, and communicating with their company's attorneys is self-evident.

Defendants' argument that the Attorney "played a limited role" in the Three Current Cases is unavailing.  (Carroll Decl. ¶

25.)  It is probably a stretch to characterize Open Text's outside

in-house counsel for intellectual property matters—an experienced

attorney who was also Counsel at Crowell—as playing an

inconsequential role in three major patent cases.  Leaving that

concern aside, though, cases do not analyze how much work a

tainted attorney performed in the cases for which disqualification

is sought.  See Pound, 135 Cal. App. 4th at 74 (disqualifying

plaintiff's firm after it and the tainted outside counsel "briefly

discussed the case" and met with plaintiffs "a few times.")  Under

the Vicarious Presumption Rule, once an attorney is presumed to

have confidential information, her law firm is presumed to have

it, too.  Cobra Solutions, 38 Cal. 4th at 847-48; See Flatt, 9

Cal. 4th at 283.

### D.   The Presumption Against Perkins Is Irrebutable and Thus Disqualification Is Mandatory

Once there is a presumption that a firm possesses

confidential information, generally that presumption is

irrebutable and disqualification is compelled.  As the California

Supreme Court has said:

> Where the requisite substantial relationship between the
> subjects of the prior and the current representations can be
> demonstrated, access to confidential information by the attorney
> in the course of the first representation (relevant, by
> definition, to the second representation) is presumed and
> disqualification of the Attorney's representation of the second
> client is mandatory; indeed, the disqualification extends
> vicariously to the entire firm.

Flatt, 9 Cal. 4th at 283 (emphasis in original); see generally

Pound, 135 Cal. App. 4th 70 (applying mandatory disqualification

rule to law firm with tainted co-counsel); In re County of Los

Angeles, 223 F.3d at 995 (noting that "[t]he [California] courts

1  of appeal developed a general rule that the presumption is not

2  rebuttable").

3     However, in one case the California Supreme Court held that

4  it "need not consider whether an attorney can rebut a presumption

5  of shared confidences, and avoid disqualification, by establishing

6  that the firm imposed effective screening procedures." SpeeDee

7  Oil, 20 Cal. 4th at 1151; see also In re County of Los Angeles,

8  223 F.3d at 997 (interpreting SpeeDee Oil as suggesting that the

9  California Supreme Court "may be inclined" to allow law firms to

10  erect ethical walls to avoid disqualification); but see Beltran,

11  867 F. Supp. 2d 1068, 1083 (C.D. Cal. 2012) (doubting that ethical

12  screening can prevent disqualification); MySpace, 526 F. Supp. 2d

13  at 1061 (questioning the same). At least one California appellate

14  court has decided that a law firm's ethical screening permitted it

15  to attempt rebutting the presumption. Kirk v. First Am. Title Ins.

16  Co., 183 Cal. App. 4th 776, 801 (2010) (holding that

17  disqualification is the "*general* rule," and that courts "should

18  presume knowledge is imputed to all members of a tainted

19  attorney's law firm," but that "in the proper circumstances, the

20  presumption is a rebuttable one, which can be refuted by evidence

21  that ethical screening will effectively prevent the sharing of

1  confidences in a particular case") (emphasis in original).[7]  Such

2  screening must be implemented in a "timely" manner.  Id. at 810.

3      In the Three Current Cases, the Attorney was not screened

4  until after Dr. Farber's deposition, approximately eight months

5  after he began serving as Open Text's outside in-house counsel.

6  (See Parker Decl. ¶¶ 4-5 .)  Since Perkins was unaware of the

7  Attorney's conflict, it did not initiate a timely screen.  See

8  Kirk., 183 Cal. App. 4th at 810 n.31 (suggesting that the ethical

9  wall must be in place "before undertaking the challenged

10  representation or hiring the tainted individual" (internal

11  quotation marks omitted); In re County of Los Angeles, 223 F.3d at

12  996  (emphasizing screening measures taken before tainted

13  individual joined the firm).  For Perkins, therefore, the

14  presumption is irrebutable.

15  **E. No Remedy Short of Disqualification Will Suffice**

16      Defendants argue that the court should fashion a remedy less

17  drastic than disqualification.  (Supp. Opp'n at 8:17-10:10, Dkt.

18  No. 122.)  The leading case on point for this issue held:

19      [E]ven when the court has misgivings about the conduct of the
       challenged attorney, it is not obligated to disqualify that
20      lawyer merely because he has run afoul of the applicable ethical
       rules.  The court is encouraged instead to examine the specific
21      facts and circumstances peculiar to the individual case to
       decide whether disqualification, or some lesser sanction, would
22      be an appropriate remedy.  In other words, even when counsel has
       been shown to have committed an ethical rule infraction the
23

24          [7]Defendants argue that Kirk forbids automatically disqualifying a law firm
25  merely because of its association with a tainted attorney, and requires proof
    that the Attorney shared confidences with the firm before disqualification is
26  appropriate.  (See Opp'n at 14:2-12.)  Defendants offer declarations from
    Perkins attorneys and others as proof that they never acquired confidential
27  information from the Attorney.  (See Dkt. Nos. 98-105.)  However, Kirk only
    allowed timely ethical screening to rebut the presumption, and further held that
28  "it is not sufficient to simply produce declarations stating that confidential
    information was not conveyed."  183 Cal. App. 4th at 801, 810.

court retains discretion to decline to order disqualification, and, in many cases, courts have done just that.

<u>MySpace, Inc.</u>, 526 F. Supp. 2d at 1063 (citation omitted).

<u>MySpace</u>, however, involved very different facts.  That case concerned a law firm that obtained a conflict waiver from its former client, enacted an ethical wall around the attorneys who worked for the prior client before engaging in work for the current client, and whose current client waived the affirmative defense that triggered the conflict—an affirmative defense that was "collateral to what this case is about."  <u>Id.</u> at 1063-65. None of these factors are present here.

## IV.   <u>Conclusion</u>

Perkins is disqualified.  The court denies the request for further discovery, because the order disqualifies Perkins, screens Open Text's General Counsel, Douglas Parker, and screens all in-house attorneys who substantively discussed the Three Current Cases with the Attorney. (<u>See</u> Parker Decl. ¶ 6 (attesting to having been "a participant in many of the instances in which [the Attorney] had an opportunity to communicate with and interact with attorneys from Perkins Coie").

The court finds that none of Perkins' attorneys had knowledge of the Attorney's prior j2 representation.  Indeed, during oral argument the court characterized Perkins as a victim of Crowell's inexplicable decision to approve the Attorney to work for Open Text.  The court affirms Perkins' innocence in this matter, and appreciate the professionalism its attorneys have exhibited. Perkins' innocence though, does not prevent its disqualification. Motions to disqualify are not about punishing guilty parties.

1  <u>Kirk</u>, 183 Cal. App. 4th at 815.  They are primarily about

2  "preserv[ing] public trust in the scrupulous administration of

3  justice and the integrity of the bar."  <u>SpeeDee Oil</u>, 20 Cal. 4th

4  at 1145.

5  **V. <u>Remedies</u>**

6       The Motion is GRANTED as to disqualifying Perkins, but is

7  DENIED as to compelling discovery.  Accordingly, IT IS HEREBY

8  ORDERED:

9       1) Perkins is disqualified from representing Defendants in

10 this litigation.  Defendants shall have until January 11, 2013, to

11 retain successor counsel and have such counsel appear in the

12 action.

13      2) In connection with the transition to new counsel, Perkins

14 shall have no further involvement in this action, except Perkins

15 may transmit to successor counsel its written files concerning

16 this action, including all documents produced by either party in

17 this action and all pleadings either filed with the court or

18 exchanged with j2 in this action.  However, notes and other non-

19 public documents (collectively "non-public documents") prepared

20 after November 1, 2011, that contain or otherwise reflect thoughts

21 of disqualified or screened firms or individuals may not be

22 transmitted, unless they are accompanied with a declaration,

23 signed under penalty of perjury, from a partner ("the Partner") at

24 Perkins with substantial familiarity with this case, attesting as

25 follows:  That the Partner has exercised due diligence in

26 evaluating the propriety of transmitting the non-public documents

27 to successor counsel, and attests to the best of such Partner's

28 information and belief that the Attorney did not provide, directly

1   or indirectly, any information contained within the non-public
2   documents.

3       3) Defendants shall immediately screen from further
4   participation in this action Douglas Parker. Any other internal
5   counsel or external counsel need not be screened, provided they
6   submit a declaration signed under penalty of perjury, attesting
7   that they have not had substantive communications with the
8   Attorney or with any one else whom they reasonably believe may
9   have received information from the Attorney concerning this
10  action.  By January 11, 2013, Defendants shall provide j2 and the
11  court with both a list identifying all persons in addition to Mr.
12  Parker who have been screened and the required affidavits.

13      4) Successor counsel shall not communicate with Crowell,
14  Perkins, Douglas Parker, the Attorney, any screened person, or any
15  other person, who had communications with the Attorney about any
16  matter related to this action.

17      5) Defendants shall reimburse j2's reasonable attorneys' fees
18  and costs incurred in connection with the Motion. By January 11,
19  2013, j2 shall submit to Defendants a statement identifying the
20  amount of such fees, together with a breakdown, by attorney, of
21  the amount of time spent on such matters.  The parties shall make
22  every effort to resolve any fee dispute without court action.

23      Nothing contained herein is intended to prevent any party,
24  person, or firm from communicating about ministerial or logistical
25  issues required to transition to new counsel.  Nothing contained
26  ///

27
28

                                    23

1  herein is intended to preclude the parties or attorneys from

2  stipulating to additional exceptions to this order in connection

3  with any collateral dispute.

4

5  IT IS SO ORDERED.

6

7

8  Dated: December 19, 2012

   DEAN D. PREGERSON
9                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28